80 N.J. 405 (1979)
404 A.2d 1
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, AND OCEAN GROVE CAMP MEETING ASSOCIATION OF THE UNITED METHODIST CHURCH, INTERVENOR-RESPONDENT,
v.
LOUIS J. CELMER, JR., DEFENDANT-APPELLANT.
The Supreme Court of New Jersey.
Argued March 6, 1979.
Decided June 21, 1979.
*408 Mr. William B. Gallagher, Jr. argued the cause for appellant (Messrs. Klitzman, Klitzman and Gallagher, attorneys).
Mr. Alfred C. Clapp argued the cause for respondent Ocean Grove Camp Meeting Association (Mr. Henry H. Paterson, attorney).
Mr. Donald W. Peppler, Jr., Assistant Monmouth County Prosecutor, argued the cause for respondent State of New Jersey (Mr. Alexander D. Lehrer, Monmouth County Prosecutor, attorney).
The opinion of the court was delivered by PASHMAN, J.
At issue in this case is the constitutionality of N.J.S.A. 40:97-1 et seq.  a statutory scheme which grants various municipal powers to the Ocean Grove Camp Meeting Association of The United Methodist Church. Specifically, defendant contends that by delegating to the Association the authority to make laws and the power to enforce those laws through the establishment of a municipal court, see N.J.S.A. 40:97-4 to 40:97-8, the Legislature has transcended the bounds of both the First and Fourteenth Amendments to the United States Constitution and Article I, paragraph 4 of our own State Constitution.
On March 24, 1976 defendant Louis Celmer, Jr. was arrested by officers of the Ocean Grove Police Department and charged with driving while under the influence of alcohol (N.J.S.A. 39:4-50(a)); speeding (N.J.S.A. 39:4-98); and disregard of a traffic signal (N.J.S.A. 39: 4-81). Following a trial in the Ocean Grove Municipal Court, defendant was found guilty of each of the three offenses.
*409 Defendant appealed these convictions to the Monmouth County Court, see R. 3:23-1, -2.[1] In addition to attacking the sufficiency of the proofs upon which the findings of guilt were based, defendant contended that the statutory scheme permitting the formation of a municipal court in Ocean Grove, see N.J.S.A. 40:97-4, was invalid under the establishment of religion clause of the First Amendment, that the municipal court was therefore an improperly constituted tribunal, and that consequently his convictions must be reversed.
On June 11, 1976, following a trial de novo based upon the record below, see R. 3:23-8(a), the County Court concluded that defendant's guilt as to all three charges had been proven beyond a reasonable doubt. Nevertheless, it reversed the speeding and disregard of a traffic signal convictions on the ground that these offenses merged into the drunk driving violation. Decision as to the merits of defendant's First Amendment claim was reserved, in order that notice of the constitutional challenge be given to the Attorney General of New Jersey, the Ocean Grove Municipal Court, and the Ocean Grove Camp Meeting Association of the United Methodist Church, see R. 4:28-4. None of the foregoing parties chose to intervene at that time.
The County Court's decision as to defendant's constitutional claim was rendered on July 12, 1976. State v. Celmer, 143 N.J. Super. 371 (Cty. Ct. 1976). It concluded that N.J.S.A. 40:97-1 et seq. did indeed violate the dictates of the First Amendment, and that therefore the Ocean Grove municipal court was without jurisdiction to determine defendant's guilt or innocence of the charged offenses. 143 N.J. Super. at 377. The drunk driving conviction there *410 imposed was consequently reversed and a judgment of acquittal entered.
On July 26, 1976 the State filed a notice of appeal to the Appellate Division. The Ocean Grove Camp Meeting Association requested and was granted permission to intervene. On March 10, 1978 the Appellate Division reversed the County Court's decision as to the constitutionality of N.J.S.A. 40:97-1 et seq. and reinstated the drunk driving conviction. State v. Celmer, 157 N.J. Super. 242 (App. Div. 1978). We granted defendant's petition for certification. 79 N.J. 464 (1979). We now reverse.

I
Resolution of defendant's constitutional challenge must begin with an examination of both the internal workings of the Ocean Grove Camp Meeting Association (Association) and the powers granted that Association by the Legislature in N.J.S.A. 40:97-1 et seq. In 1869, a small band of Methodist clergy led by Rev. William B. Osborn established a camp meeting ground upon 260 acres of land which now form the nucleus of Ocean Grove. The site quickly attracted adherents, and within a short period of time the area was transformed from a sparsely settled expanse into a thriving community of fellow worshippers. See Gibbons, History of Ocean Grove, 9-11 (1939).
In 1870 the association which these people had established was incorporated by State charter under the name "The Ocean Grove Camp Meeting Association of the Methodist Episcopal Church" L. 1870, c. 157. That name has since been changed to "The Ocean Grove Camp Meeting Association of The United Methodist Church" L. 1968, c. 231. At present, the lands owned by the corporation form a part of Neptune Township.
At the time it obtained its corporate charter, the Association adopted a set of by-laws to regulate the internal affairs of the organization. These by-laws make clear that the *411 main purpose underlying the formation of the Association was, and remains today, that of
provid[ing] and maintain[ing] for the members and friends of The United Methodist Church a proper, convenient and desirable permanent camp meeting ground and Christian seaside resort * * *.
[Association By-Laws, Art. II]
See L. 1870, c. 157, § 1.
In order that this goal be achieved, the Association retained title to all lands, streets, walks, parks, and other public places situated within the camp grounds. The property was, however, subdivided and individual lots leased for 99 years, renewable in perpetuity, to persons "who may be vouched for as of good moral character and in sympathy with the objects of [the] Association." Association By-Laws, Art. XI, § 1. Moreover, all transfers of lots were, and remain, subject to the approval of the Association's president or designated representative. Id.
The by-laws also established a governmental apparatus in order to manage the internal affairs of the community. As presently constituted, legislative and executive powers within the Association are reposed in a 26 member Board of Trustees. At least ten of these trustees must be ministers and ten, laymen. All, however, are required to "be and remain members of The United Methodist Church in good and regular standing." Association By-Laws, Art. III, § 1. This Board is self-perpetuating in that the trustees themselves select their replacements and successors. Id. Moreover, only the trustees can revise or amend the by-laws, and hence only they can alter the manner in which the present government is structured. Id.
The by-laws also provide for the election of "associate" trustees  persons who "have the privilege of attending [Board] meetings" but who cannot vote upon matters therein considered. Id., Art. III, § 5. Associate trustees need not be adherents of the Methodist faith; they must, however, "be *412 member[s] of a Christian Church in good and regular standing." Id.
Responsibility for the day-to-day operation of the community has been delegated by the by-laws to those trustees who serve on the Board's executive, program and development committees. Id., Art. V, § 2. The executive committee serves as the administrative arm of the Board, and represents the Board in all official matters. Id., Art. VII. The program committee's main responsibility is that of organizing religious services and meetings for Ocean Grove's inhabitants. Id., Art. VIII. The development committee is charged with the duty of initiating and implementing financial programs "necessary to provide and maintain [Ocean Grove as] * * * a proper, convenient and desirable permanent Camp Meeting Ground and Christian Seaside Resort." Id., Art. IX, § 2.
Beginning with the Association's incorporation in 1870 and continuing to the present day, the Legislature has granted Ocean Grove's Board of Trustees various police powers ordinarily exercisable only by municipalities. See L. 1870, c. 157; L. 1878, c. 40; L. 1878, c. 76; L. 1881, c. 211; L. 1894, c. 90 as amended L. 1953, c. 37, § 274 (now codified at N.J.S.A. 40:97-1 et seq.). As now in effect, these statutes delegate to the Board responsibility for the construction and maintenance of public highways, streets, walks, parks, and sewers located within the boundaries of the camp grounds. N.J.S.A. 40:97-1, -2. The trustees also possess veto power over the construction of any public highway in Ocean Grove, or the implementation of public forms of transportation. N.J.S.A. 40:97-3. Finally, the trustees are given "exclusive jurisdiction" to "maintain and preserve order" within Ocean Grove and, in order to facilitate the achievement of that end, have been accorded the power to "make and enforce rules and regulations to promote and protect the public health," N.J.S.A. 40:97-4, and to "prescribe penalties for [their] violation," N.J.S.A. 40:97-7. These rules, whether passed in the form of ordinances, by-laws or resolutions, may be enforced by a municipal court *413 established by the trustees, N.J.S.A. 40:97-4, -5, -6, and are accorded by statute the same force and effect as municipal ordinances, N.J.S.A. 40:97-8.
The municipal court of Ocean Grove, as presently constituted, was established through an ordinance adopted by the Association's trustees on April 17, 1964. A court with similar powers has existed within the community since 1876. See L. 1876, c. 149, § 2. The magistrate of the court is appointed by the Board for a term of three years and until such time as a successor is appointed and qualified. It was this court that initially found defendant guilty of the charges which form the basis of the present suit. The trustees have also established an Ocean Grove Police Department in order to secure compliance with both the orders of that court and the "ordinances" enacted by the Board.
Defendant contends that the statutory scheme codified as N.J.S.A. 40:97-1 et seq. is violative of the First Amendment in that it cedes to a religious organization several governmental powers, including the power to make laws and the power to establish a municipal court in order to enforce compliance with those laws. Consequently, he maintains that the Ocean Grove Municipal Court  being established by a Board ordinance  is an improperly constituted tribunal and hence without jurisdiction to determine his guilt or innocence of the charged offenses. For the reasons to be given below, we conclude that defendant's contentions in this regard are meritorious.

II
The First and Fourteenth Amendments to the United States Constitution prohibit state legislatures from enacting any law "respecting an establishment of religion * * *."[2] As the Supreme Court has often noted, the framers' *414 choice of the word "respecting" was not inadvertent. The authors of the federal constitution did not merely wish to preclude the actual "establishment" of a state church or a state creed; rather, they also sought to outlaw any enactment which might constitute "a step that could lead" to the unity of government and religion. Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971); see, e.g., Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed. 2d 982 (1961); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). In the oft-quoted words of Thomas Jefferson, the First Amendment seeks to erect, as nearly as possible, "a wall of separation between Church and State." See, e.g., Torcaso, supra, 367 U.S. at 493, 81 S.Ct. at 1682, 6 L.Ed.2d at 986; Everson, supra, 330 U.S. at 16, 67 S.Ct. at 511, 91 L.Ed. at 723.
The reasons which impelled the framers to incorporate the establishment clause into the Constitution have been detailed elsewhere, and need not here be repeated. See, e.g., Everson, supra, 330 U.S. at 8-15, 67 S.Ct. at 507-511, 91 L.Ed. at 719-723; id., 330 U.S. at 28-48, 67 S.Ct. at 517-527, 91 L.Ed. at 730-740 (Rutledge, J., dissenting); McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). See generally L. Tribe, American Constitutional Law, § 14-3 at 816-819 (1978). We merely note that complete separation of government and church was considered both "best for the state and best for religion." McCollum, supra, 333 U.S. at 232, 68 S.Ct. at 475, 92 L.Ed. at 669 (Frankfurter, J., concurring). The framers believed that individual religious liberty could be safeguarded only if government "was stripped of all power to tax, to support, or otherwise to assist any or all religions," Everson, supra, 330 U.S. at 11, 67 S.Ct. at 509, 91 L.Ed. *415 at 721, and conversely that only by "rescu[ing] temporal institutions from religious interference" could the civil liberties of the populace be preserved, id., 330 U.S. at 15, 67 S.Ct. at 511, 91 L.Ed. at 723. See L. Tribe, supra, § 14-3 at 816-819.
In keeping with the intent underlying the adoption of the establishment clause, the Supreme Court has consistently emphasized that "active involvement of the sovereign in religious activity" cannot be tolerated. Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697, 701 (1970); see, e.g., Lemon, supra, 403 U.S. at 612, 91 S.Ct. at 2111, 29 L.Ed.2d at 755; Resnick v. East Brunswick Tp. Bd. of Ed., 77 N.J. 88, 108 (1978). As Justice Black has forcefully noted:
The `establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. * * * No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.
[Everson, supra, 330 U.S. at 15-16, 67 S.Ct. at 511-512, 91 L.Ed. at 723 (emphasis supplied)]
See, e.g., Torcaso, supra, 367 U.S. at 492-493, 81 S.Ct. at 1682, 6 L.Ed.2d at 986. In its more recent opinions, the Court has characterized this latter requirement of the establishment clause as a prohibition of "excessive government entanglement with religion." Walz, supra, 397 U.S. at 674, 90 S.Ct. at 1414, 25 L.Ed.2d at 704; see, e.g., National Labor Relations Board v. Catholic Bishop of Chicago, ___ U.S. ___, ___, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533, 542 (1979); Lemon, supra, 403 U.S. at 613, 91 S.Ct. at 2111, 29 L.Ed.2d at 755; Resnick v. East Brunswick Tp. Bd. of Ed., supra, 77 N.J. at 114. See generally L. Tribe, supra, § 14-12 at 865-880.
*416 Regardless, however, of the precise phraseology that one utilizes to describe this First Amendment mandate, there can be no question but that at a minimum it precludes a state from ceding governmental powers to a religious organization. Yet, through the enactment of N.J.S.A. 40:97-1 et seq., our Legislature has sought to do just that.
As detailed in Part I ante, the Ocean Grove Camp Meeting Association of The United Methodist Church is first and foremost a religious organization. Such a state of affairs is not only evident from its name, but also from the purposes underlying its formation, its internal governmental structure, and the various activities which it undertakes.
The main goal sought to be achieved by the Association is that of providing and maintaining "for the members and friends of The United Methodist Church" a proper, convenient and desirable permanent "camp meeting ground and Christian seaside resort." Association By-Laws, Art. II (emphasis supplied). In order that this goal not be frustrated, only Methodists in good and regular standing can be selected to sit on the Board of Trustees  the Association's governing body. Id., Art. III, § 1. At least ten of these trustees must be Methodist ministers. Id., Art. III, § 1. Finally, two of the three Board committees responsible for the day-to-day functioning of the community deal exclusively with non-secular matters. The program committee organizes and oversees Ocean Grove's "religious services," id., Art. VIII, § 2, while the development committee is charged with the duty of implementing financial programs necessary to maintain Ocean Grove's character as a "Christian" Seaside Resort. Id., Art. IX, § 2.
Through the enactment of N.J.S.A. 40:97-1 et seq., the Legislature has in effect transformed this religious organization into Ocean Grove's civil government. Methodist ministers and laymen have been granted responsibility for the construction and maintenance of public streets, walks, parks, and sewers. N.J.S.A. 40:97-1, -2, -3. They have also been delegated the power to make laws applicable to all *417 who might find themselves situated within the boundaries of the Camp Meeting grounds, to prescribe penalties for the violation of these laws, and to establish both a police department and a municipal court in order to secure compliance with these laws. N.J.S.A. 40:97-4, -5, -6, -7, -8.
In effect, the Legislature has decreed that in Ocean Grove the Church shall be the State and the State shall be the Church. Individuals chosen by the followers of a particular faith to safeguard their spiritual and cultural way of life have been accorded the authority to determine what shall constitute acceptable modes of conduct for Methodists and non-Methodists alike. Government and religion are so inextricably intertwined as to be inseparable from one another. Such a fusion of secular and ecclesiastical power not only violates both the letter and spirit of the First Amendment, it also runs afoul of the "establishment clause" of our own State constitution, see N.J. Const. (1947), Art. I, ¶ 4.
Other constitutional infirmities are also manifest in the system of "government" presently existing in Ocean Grove. Article I, paragraph 4 of the New Jersey Constitution prohibits the State from imposing a "religious ... test ... as a qualification for any office or public trust." The "free exercise" clause of the First Amendment has been interpreted to likewise forbid a state to condition public office upon an individual's religious beliefs. See Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). Through the enactment of N.J.S.A. 40:97-1 et seq., however, the Legislature has ordained that non-Methodists cannot participate in governmental decisions relating to the management of Ocean Grove's secular affairs.
For the foregoing reasons, N.J.S.A. 40:97-1 et seq. is hereby declared unconstitutional and of no force and effect. The Ocean Grove Camp Meeting Association of The United Methodist Church can be delegated neither the power to manage public highways or other public property, the power to make laws, nor the power to enforce Board rules *418 through establishment of a police department and municipal court. These functions must henceforth be exercised by the governing body of Neptune Township, of which Ocean Grove forms a part.
To the extent that Schaad v. Ocean Grove Camp Meeting Ass'n, 72 N.J. 237, 250-270 (1977), Percello v. Ocean Grove Camp Meeting Association, 100 N.J.L. 407 (E & A 1924), and McCran v. Ocean Grove, 96 N.J.L. 158 (E & A 1921), are inconsistent with the foregoing, they are hereby overruled.
The "municipal court" which initially tried and convicted defendant was established by an "ordinance" adopted by the Association's Board of Trustees on April 17, 1964. Its magistrate was appointed by this same Board. Consequently, that "court" is an improperly constituted tribunal and hence possessed no jurisdiction to determine defendant's guilt or innocence of the charged offenses. The convictions there obtained thus cannot stand.
This is not to say, however, that every judgment that has been entered in Ocean Grove's Municipal Court since its inception is void. We have long held that when a statute or ordinance creates an office or provides for an officer to carry out its functions, the acts of that officer undertaken in good faith and prior to a judicial declaration of nullity have the force and effect of law notwithstanding a constitutional defect in the enabling legislation. See, e.g., State v. Pillo, 15 N.J. 99 (1954), cert. den. 348 U.S. 855, 75 S.Ct. 78, 99 L.Ed. 673 (1954); Lang v. Bayonne, 74 N.J.L. 455, 462 (E & A 1907). In the interim, the officer is an "officer de facto" and the actions he undertakes in that capacity retain their validity. See Lang, supra, 74 N.J.L. at 462. Therefore, matters which have been finally disposed of in Ocean Grove Municipal Court and are not presently pending judicial review cannot be relitigated, nor can entries of judgments pertaining thereto be collaterally attacked.

*419 III
The question which remains is whether this case should be remanded for a new trial in Neptune Municipal Court, see R. 1:13-4(a), or whether a judgment of acquittal should be entered. The County Court judge concluded that a remand was foreclosed by N.J.S.A. 39:5-3. That statute provides in part:
When a person has violated a provision of this subtitle, the magistrate may, within 30 days after the commission of the offense, issue process ... for the appearance or arrest of the person so charged. * * *
[emphasis supplied]
The County Court judge treated this provision as a statute of limitations. Since the charges against defendant were not filed with a court of competent jurisdiction within 30 days of the offense, he concluded that entry of a judgment of acquittal was mandated. 143 N.J. Super. at 377.
Whether N.J.S.A. 39:5-3 does indeed constitute a 30 day statute of limitations is a difficult question which we need not decide. For even assuming that its provisions do not bar a new trial, we have concluded that a remand of this case to the Neptune Township Municipal Court would violate the principle of "fundamental fairness." See State v. Tropea, 78 N.J. 309, 315-316 (1978); cf. Rodriquez v. Rosenblatt, 58 N.J. 281, 294 (1971).
Defendant has already been tried once for his alleged offenses  albeit before an improperly constituted tribunal. He has thus been made to suffer, in the words of Justice Clifford, the "embarrassment, expense and anxiety ... encountered by those faced with criminal prosecutions." State v. Tropea, supra, 78 N.J. at 316. More than three years have elapsed since the conduct which formed the basis of the charges against him was allegedly engaged in. It is therefore not unlikely that his ability to muster a defense has diminished. Finally, it is the State who, through the enactment of N.J.S.A. 40:97-1 et seq., created a situation *420 in which the improper tribunal could be established. Under these circumstances, "a rerun at the trial level would result in unwarranted harassment and should be avoided * * *." State v. Tropea, supra, 78 N.J. at 316.

IV
In closing, we wish to emphasize that our holding today should not be read as impugning the integrity of either the Association's Board of Trustees or the way of life it has sought to institutionalize in Ocean Grove. We have no doubt that the Board has worked long and hard to establish rules which it earnestly feels will best secure peace, happiness, and tranquillity for the community's inhabitants. The administration of the camp grounds has earned the admiration of many citizens and public officials. Indeed, Ocean Grove is now enrolled in the National Registry of Historic Places.
This way of life need not be abandoned on account of today's decision. The Association may continue to adopt rules which it deems necessary to protect Ocean Grove's unique cultural and spiritual characteristics. The inhabitants of Ocean Grove  and indeed all others who so choose  remain free to voluntarily abide by those rules. The Board, however, cannot exercise essential governmental functions, make law or force compliance with its rules through the establishment of a municipal court and police department. These are functions which can be exercised only by the people as a whole.
Accordingly, the judgment of the Appellate Division is reversed, and this case remanded for entry of judgments of acquittal on all three charges.
For reversal  Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER  7.
For affirmance  None.
NOTES
[1] This rule was amended effective December 1978 to provide for appeal as of right to the Superior Court, Law Division from a final judgment of a municipal court. See also, comments on R. 1:1-1 and R. 1:1A.
[2] The strictures of the First Amendment are applicable to states through the due process clause of the Fourteenth Amendment. See, e.g., Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).